AL/DMP:CRH/ICR
F. #2020R01158

Clerk's Office
Filed Date:

12/30/2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

TICKETMASTER L.L.C.,

                     Defendant.

I N F O R M A T I O N

Cr. No. <u>20-563 (MKB)</u>

(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(2), 982(b)(1), 1030(a)(2)(C),
1030(a)(4), 1030(c)(2)(A),
1030(c)(2)(B), 1030(c)(3)(A),
1030(i)(1), 1030(i)(2), 1343, 1349, 2
and 3551 <u>et</u> <u>seq</u>.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Information:

I.    <u>The Defendant, Victim Company and Relevant Participants</u>

        1.    The defendant TICKETMASTER L.L.C. ("TICKETMASTER"), is and

was at all relevant times a wholly owned subsidiary of Live Nation Entertainment, Inc. ("Live

Nation"), a publicly traded corporation that operated from offices located in New York, New York;

San Francisco and Los Angeles, California; and other locations.   TICKETMASTER is and was

primarily engaged in the business of selling and distributing tickets to events and concerts at

venues with which it had contracted to host such events and concerts.

        2.    The Victim Company[1]  was a company based in the United Kingdom, with

U.S. headquarters in Brooklyn, New York, that sold presale tickets, described in greater detail

---

[1] The identities of the Victim Company and all other individuals and entities referred to
in this Information are known to the United States Attorney.

below, for musical artists and management companies.   The Victim Company merged with another company in or about 2015, and declared bankruptcy in 2016.

3.   Coconspirator-1 was a citizen of the United Kingdom who resided in Brooklyn, New York.   Coconspirator-1 was the Victim Company's first employee in the United States and worked in the Victim Company's offices in Brooklyn, first as a consultant in March 2010, and then as the Senior Vice President for Global Operations and General Manager for North America from approximately May 2010 to July 26, 2012.   Coconspirator-1 became employed by Live Nation in its TicketWeb subsidiary in approximately August 2013.   In approximately January 2015, he was promoted to Director of Client Relations in TICKETMASTER's Artist Services division and received a raise.   Coconspirator-1 was terminated by Live Nation and TICKETMASTER in approximately October 2017.

4.   Zeeshan Zaidi was a citizen of Canada and a naturalized citizen of the United States, with graduate degrees from Harvard Law School and Harvard Business School, who resided in New York, New York.   In approximately November 2013, Zaidi was retained by Live Nation as a consultant to work on a project, as to which he reported to senior executives of TICKETMASTER.   In approximately August 2014, Zaidi was formally hired to lead TICKETMASTER's Artist Services division.   In approximately October 2017, Zaidi was terminated by Live Nation and TICKETMASTER.   On October 18, 2019, Zaidi pled guilty in the United States District Court for the Eastern District of New York to one count of conspiring to access protected computers without authorization and to commit wire fraud, in violation of Title 18, United States Code, Section 371.   See United States v. Zeeshan Zaidi, 19 CR 450 (MKB) (E.D.N.Y.).

II.     Factual Background

5.     As detailed below, TICKETMASTER employees and agents, including Coconspirator-1 and Zaidi, accessed Victim Company computer systems without authorization from Live Nation and TICKETMASTER computer systems on numerous occasions between August 2013 and December 2015.   The information obtained from such unauthorized access was used for, among other things, preparing strategy presentations for senior Live Nation and TICKETMASTER executives that benchmarked competitor products and services, including those offered by the Victim Company.

A.     The Presale Ticketing Market

6.     Through a corporate division known during the relevant time period as "Artist Services," TICKETMASTER sold "presale tickets," which were tickets to an event that were sold in advance of general ticket sales, typically though an artist's website to members of a "fan club" or through some other promotion.   Although TICKETMASTER's contracts with venues gave it exclusive rights to sell all tickets at particular events, TICKETMASTER allowed artists to sell a portion of presale tickets "off platform," i.e., on their own or through another company.   Typically, TICKETMASTER permitted up to 8% of presale tickets to be sold off-platform by another company, provided that certain rules established by TICKETMASTER were followed.   Off-platform sales reflected a loss of revenue to TICKETMASTER, because TICKETMASTER was unable to charge service fees in connection with the sale of off-platform tickets.   One of the business responsibilities of TICKETMASTER's Artist Services division was to encourage artists and their management companies to use TICKETMASTER's ticketing platform to sell presale tickets, and in certain circumstances to discourage artists from using competitor ticketing services to sell presale tickets off-platform.

7.      The Victim Company offered artists the ability to sell presale tickets off of TICKETMASTER's platform by operating or helping the artist to operate an online ticketing platform.    As part of its services to its artist clients, the Victim Company offered a data analytics package for ticketing known as an Artist Toolbox (the "Toolbox").    The Toolbox was a web-based software application that provided the artists or the artist's manager real-time data about ticket sales effected through the Victim Company.    Among other things, the Toolbox provided information about where tickets were being purchased, the number of tickets sold at each venue, information about tickets sold on particular dates and email addresses collected from ticket purchasers that could then be added to artists' mailing lists.    The Toolbox was designed for use by the artist and his or her management company.    Toolboxes were generally set up for each artist or manager who did business with the Victim Company, and each Toolbox was protected with a unique username and password known to the artist and/or manager, as well as Victim Company employees.

8.      The Victim Company created individualized web pages for its clients showing event listings and containing "Buy Tickets" links that users could use to purchase tickets. The Victim Company also created such web pages for artists in draft form.    These draft ticketing web pages were either "mock" sites used to market the Victim Company's services to prospective clients, or dormant because the event had not yet been announced.    The Victim Company's draft ticketing web pages were accessible via the Internet and were not password-protected.    However, the web pages were not indexed in search engines, and therefore could not be located by the public using search engines such as Google.    Instead, in order to access one of the ticketing web pages, a person would have to figure out its exact Uniform Resource Locator ("URL"), i.e., its webpage address.    The Victim Company did not advertise these webpages to the public until the artist and

its management company were ready to sell tickets to the artist's shows.    Until the Victim Company, the artist or the artist's manager publicly disseminated the URLs to the ticketing web pages, the Victim Company intended to restrict access to the ticketing web pages only to the Victim Company, the artist and the artist management company.

B.    Coconspirator-1's Separation Agreement and Employment by Live Nation and
TICKETMASTER

9.    During and in the course of his employment with the Victim Company, Coconspirator-1 was given access to confidential and proprietary information about the Victim Company and its clients, including the usernames and passwords to the Victim Company Toolboxes, and the Victim Company's practice of creating draft ticketing web pages for clients or prospective clients, thus allowing him to locate URL addresses for such pages even after he left the Victim Company in 2012.

10.    On or about August 28, 2012, Coconspirator-1 signed a "Separation and Release Agreement" with the Victim Company (the "Separation Agreement").    Under the Separation Agreement, Coconspirator-1 acknowledged that during his employment he "had access to confidential and proprietary information relating to [the Victim Company], its artists, its business and third parties with whom [the Victim Company] does or did business."    The Separation Agreement listed illustrative examples of the types of confidential information to which Coconspirator-1 had access, including "client lists," "passwords," "marketing strategies" and "financial information."    Under the terms of the Separation Agreement, Coconspirator-1 agreed that "[a]t all times hereafter," he would "maintain the confidentiality of all Confidential Information," and that he would not "directly or indirectly, make any disclosure of Confidential Information to any third party" or "make any use of Confidential Information" for Coconspirator-

1's "own benefit or the benefit of any third party, without [the Victim Company's] prior written consent."

11.     Coconspirator-1 further agreed that he would return to the Victim Company "all material or documents containing Confidential Information" and would "not retain any copies, duplicates, reproductions or excerpts of such material or documents." Coconspirator-1 agreed that until July 26, 2013, he would not "engage in the businesses of direct retail ticketing, presale ticketing or technology ticketing enablement services," and would not "accept employment, consult for or participate, directly or indirectly, in the ownership or management of any enterprise anywhere in the United States engaged in such a business."

12.     In exchange for agreeing to these and other terms, and as part of this Separation Agreement, the Victim Company paid Coconspirator-1 approximately $52,970.

13.     In or about May 2013, Coconspirator-1 sent an email attaching his resume to a Vice President of TICKETMASTER who worked in its Artist Services division ("Executive-1"). Executive-1 then emailed Coconspirator-1's resume to a Live Nation executive at a different division of the company called TicketWeb that focused on ticketing at small venues ("Executive-2"), and noted Coconspirator-1's "ticketing experience that includes a stint at [Victim Company]." Coconspirator-1 subsequently spoke with another Live Nation TicketWeb executive about a position in client development ("Executive-3"). On or about May 28, 2013, Coconspirator-1 completed an application for employment with Live Nation.

14.     In or about June 2013, Coconspirator-1 discussed the Separation Agreement with Executive-3 and emailed him a copy of the Separation Agreement. On or about July 1, 2013, Live Nation offered Coconspirator-1 a client development position at TicketWeb in a written letter (the "Offer Letter").

15.    The Offer Letter specifically referenced Coconspirator-1's Separation Agreement and "remind[ed]" Coconspirator-1 of his "obligations to preserve the trade secrets and confidential and proprietary information of [Coconspirator-1's] current and prior employers." The Offer Letter further advised Coconspirator-1 that he "must not retain copies of any trade secret or confidential and proprietary information of any prior employer," and further warned Coconspirator-1 that he could "not bring such materials to work or otherwise utilize such materials as part of [his] work for [Live Nation]."   In signing the letter and accepting the offer, Coconspirator-1 agreed that he had "not taken any trade secret or confidential or proprietary information from [his] former employers and ha[d] not disclosed any such information to any employees of Live Nation Entertainment."   Coconspirator-1 further acknowledged his "obligation not to disclose any such information in the future."

16.    On or about July 2, 2013, Coconspirator-1 signed the Offer Letter and accepted Live Nation's offer of employment.

17.    On or about August 2, 2013, shortly after beginning his employment with Live Nation at TicketWeb, Coconspirator-1 signed Live Nation's standard "Proprietary Information Agreement," in which he agreed to maintain the confidentiality of, and not to disclose, confidential proprietary information owned by Live Nation.   Live Nation's Proprietary Information Agreement contained the following paragraph:

> I understand that [Live Nation] does not want, and will not permit me to access, use, or disclose, any confidential or proprietary information belonging to any third parties, including former employers.   I represent and warrant and covenant that I have not and will not disclose to [Live Nation], or use in connection with my activities as an employee of [Live Nation], or induce [Live Nation] to use, any proprietary or confidential information or trade secrets, or any other subject matter that is the subject of Proprietary Rights, of myself or any third party at any time, including, without

limitation, any proprietary or confidential information or trade secrets of any former employer.

III.   TICKETMASTER Solicits and Obtains Victim Company Information from Coconspirator-1

18.   From the beginning of Coconspirator-1's employment with Live Nation, he repeatedly violated his duty to protect the Victim Company's confidential and proprietary information, as set forth in Live Nation's own internal policies and agreements with Coconspirator-1 and in Coconspirator-1's Separation Agreement with the Victim Company. Among other things, Coconspirator-1 and TICKETMASTER executives accessed, without authorization, protected Victim Company computer systems in order to obtain Victim Company information.   They did so using log-in credentials that Coconspirator-1 had obtained during his employment with the Victim Company and retained in violation of the Separation Agreement and Live Nation policy.   TICKETMASTER executives, including Zaidi, also solicited, and Coconspirator-1 provided, confidential proprietary information about the Victim Company and its business that Coconspirator-1 had obtained while employed by the Victim Company.

A.   TICKETMASTER Executives Solicit Victim Company Information from Coconspirator-1

19.   Just weeks after Coconspirator-1 started working at TicketWeb, TICKETMASTER executives began soliciting information from Coconspirator-1 regarding the Victim Company.

20.   For example, on or about August 29, 2013, Executive-2 emailed Coconspirator-1 a draft presentation intended for a high-level corporate officer of Live Nation ("Corporate Officer-1") and a high-level corporate officer of TICKETMASTER ("Corporate Officer-2") that analyzed TICKETMASTER's competitors in the presale ticketing market, and asked Coconspirator-1 for his insight about "the competitive gaps with some of the smaller

providers." Coconspirator-1 responded with a detailed analysis of the Victim Company's competitive strengths relative to TICKETMASTER, which Executive-2 used to update the presentation and emailed to, among others, Executive-1.

21. In or about November 2013, Executive-2 again asked Coconspirator-1 to provide information regarding Coconspirator-1's former employer, this time to TICKETMASTER executive Zaidi, described as "a new member of the Ticketmaster team" who had joined TICKETMASTER to "formulate a compelling offer for Artist (presales, merch, fanclubs, etc)." Coconspirator-1 agreed, promising Executive-2 and Zaidi that he would "pass on as much information as you need about [the Victim Company]."

22. In subsequent emails in or about November 2013, regarding a new tour planned by an artist that Coconspirator-1 described as "a financial foundation for [the Victim Company] from day one," Coconspirator-1 offered to provide Executive-2 and Zaidi information regarding the fees applied by the Victim Company to ticket prices, and Coconspirator-1 shared with them the URLs for draft ticketing web pages that the Victim Company had built for the artist's planned and previous tours but had not disseminated to the public. Coconspirator-1 made clear that he obtained the information because, while employed at the Victim Company, he had personally handled the artist's tours in North and South America. During these communications, Executive-2 described how the goal was to "choke off [Victim Company]" and "steal back one of [Victim Company]'s signature clients." Coconspirator-1 responded by offering that they could "cut [Victim Company] off at the knees" if they could win back presale ticketing business for a second major artist by offering the same ticketing fee structure that the Victim Company gave to the second artist.

B.    January to June 2014: Coconspirator-1 and Other TICKETMASTER Executives
Repeatedly Access the Victim Company Computer Systems Without
Authorization

23.    On or about January 9, 2014, Coconspirator-1 emailed Executive-1 and Zaidi a collection of "info from [the Victim Company] that might be useful as an insight into their operations."

24.    The first category of information Coconspirator-1 provided included usernames and passwords for Toolboxes that the Victim Company had established for three different artist management companies.    Coconspirator-1 encouraged the two TICKETMASTER executives to "screen-grab the hell out of the system," and warned them that Coconspirator-1 and TICKETMASTER were not authorized to access the Victim Company Toolboxes:

*I must stress that as this is access to a live [Victim Company] tool
I would be careful in what you click on as it would be best not [to]
giveaway that we are snooping around.*

(Emphasis in original.)    In addition, Coconspirator-1 attached two Victim Company-related Excel spreadsheets: (1) a "booking fee calculator" that gave "the full breakdown of the fees [the Victim Company] appl[ies] to the . . . normal ticket prices"; and (2) an "Account Management Tool" that "was used for every new artist tour" to "provide the biz-dev and client services guys an idea of the profitability of the tour."

25.    Zaidi responded to Coconspirator-1's email with approval: "Awesome – thanks [Coconspirator-1]!"

26.    Later the same day, Coconspirator-1, Executive-1 and Zaidi participated in a conference call, during which Coconspirator-1 used, without authorization, the Victim Company's usernames and passwords to access Victim Company Toolboxes, and used Internet presentation software to demonstrate the functionality of the Victim Company Toolbox application and data to Executive-1 and Zaidi.    Coconspirator-1 and Zaidi participated in this call from

TICKETMASTER's New York office, and Executive-1 participated from TICKETMASTER's Los Angeles office.

27.     Zaidi promptly made use of the information to prepare a presentation for other senior TICKETMASTER executives that was intended to "benchmark," or compare, TICKETMASTER's Artist Services and other ticket offerings against those of, among other competitors, the Victim Company.    Included in the presentation, which Zaidi emailed on or about January 10, 2014, were multiple slides that included screenshots of the Victim Company Toolboxes that were accessed the previous day by Coconspirator-1, Executive-1 and Zaidi.

28.     In or about May 2014, Corporate Officer-1 and Corporate Officer-2, communicated several questions about the Victim Company to Zaidi.    Subsequently, Zaidi, Coconspirator-1 and other TICKETMASTER employees made additional unauthorized intrusions into protected Victim Company computer systems to collect information about the Victim Company's presale offerings to artists.

29.     On or about May 8, 2014, Corporate Officer-1 emailed, among others, Corporate Officer-2, Executive-1 and Zaidi, stating "[Victim Company] pushing hard – I need to see exact plan for our fan club product when we announce it etc[.]"    After Zaidi responded with some general information about timing, Corporate Officer-1 clarified that his focus was on understanding how TICKETMASTER's presale online offering compared with the Victim Company's Toolbox: "When can you show me wireframes etc so I can see exact [Victim Company] vs our product[?]"

30.     Zaidi turned to Coconspirator-1 for help responding to this request from Live Nation's senior management.    On or about May 11, 2014, Zaidi emailed Coconspirator-1, explaining that "[o]n the [Victim Company] front, I'm now preparing a deck for [Corporate

Officer-1] about our strategy, especially to create comparable platforms," and asked if Coconspirator-1 could "do a screenshare/demo" on May 14, 2014, at a meeting in San Francisco, California with employees from TICKETMASTER's Artist Services division who had been tasked with "building the platform."

31.    Coconspirator-1 responded that he would "be happy to help out," and Zaidi replied that he wanted Coconspirator-1 to demonstrate the Victim Company's Toolbox. Coconspirator-1 specifically told Zaidi that he would "pull together a list of the log-ins and URL's that I still have access to for this so I can give the team as much insight as possible."   Zaidi responded, "That would be perfect."

32.    On or about May 12, 2014, Zaidi emailed multiple TICKETMASTER employees in the Artist Services division with an agenda for a two-day Artist Services "Summit" meeting in San Francisco beginning on or about May 14, 2014.   The second item on the agenda for that day was "[Victim Company]: product review (1.5 hrs)."   Zaidi further noted, "[Coconspirator-1] will be coming in for this!"

33.    At least 14 Live Nation and TICKETMASTER employees were in attendance at the Artist Services Summit on or about May 14, 2014, including, among others, Coconspirator-1, Executive-1, Executive-2 and Zaidi.   During his presentation, Coconspirator-1 used a username and password he had retained from his employment at the Victim Company to log in to a Victim Company Toolbox, without authorization, from a Live Nation computer. Coconspirator-1 provided a demonstration of the Toolbox application and the data that the Victim Company made available to its clients.   Coconspirator-1 projected his presentation onto a large screen in a conference room for the benefit of the participants of the meeting.

34.     Log data obtained from the Victim Company indicates that on or about May 14, 2014, between 10:43 a.m. and 11:14 a.m. Pacific Time, the approximate time of Coconspirator-1's presentation, an individual or individuals logged into a Victim Company Toolbox for a specific artist management company from an Internet Protocol ("IP") address registered to a subsidiary of Live Nation based in San Francisco, California.

35.     On or about May 27, 2014, following the Artist Services Summit, Zaidi emailed a draft presentation intended for Corporate Officer-1 to other employees in the Artist Services division.   The presentation evaluated the strengths and weaknesses of competitors' product offerings and included screenshots from some of the Victim Company Toolboxes that had been accessed in or about January 2014 by Coconspirator-1, Executive-1 and Zaidi.   In his email, Zaidi asked the Artist Services division employees to assist him with refining the presentation, and they turned to Coconspirator-1 for more information about the Victim Company.

36.     For example, on or about May 28, 2014, a TICKETMASTER marketing executive ("Executive-4") asked Coconspirator-1 to help Executive-4 estimate the Victim Company's annual business so that the presentation could articulate to Corporate Officer-1 "what is on the table for us to try and win back with our new service offering[.]"   The following day, Coconspirator-1 responded to Executive-4 and, copying Zaidi, provided an internal Victim Company "Weekly Heads of Department" report that Coconspirator-1 had retained from his employment with the Victim Company, explaining that it "included the projections vs real sales across tickets and merch in all territories that [the Victim Company] operated in."   Coconspirator-1 also provided "[the Victim Company's] Growth plan for 2012/2013," which he had retained from his employment at the Victim Company, stating that he had already provided it to Zaidi "at

the beginning of the year."   Coconspirator-1 stated that he hoped the attached documents would provide Executive-4 with "insight in the [Victim Company] business."

37.   On or about June 2, 2014, Coconspirator-1 again emailed Zaidi the Victim Company Toolbox usernames and passwords that he had sent in or about January 2014, and included three new sets of Toolbox usernames and passwords.   Coconspirator-1 again repeated the same warning that access to the Victim Company Toolboxes was unauthorized:

> *I must stress that as this is access to a live [Victim Company] tool*
> *I would be careful in what you click on as it would be best not [to]*
> *giveaway that we are snooping around.*

(Emphasis in original.)   Log data obtained from the Victim Company indicates that the three new Victim Company Toolboxes identified in Coconspirator-1's email were accessed from an IP address registered to TICKETMASTER's New York offices on or about June 2, 2014.

38.   On or about June 3, 2014, Zaidi reviewed the presentation with Corporate Officer-2.

39.   On or about June 19, 2014, Zaidi emailed a revised version of the presentation to Corporate Officer-1, Corporate Officer-2 and another high-level corporate officer of Live Nation ("Corporate Officer-3").   The presentation again included the screenshots of the Victim Company Toolbox taken in or about January 2014.

40.   After giving the presentation to Corporate Officer-1, Corporate Officer-2 and Corporate Officer-3, Zaidi distributed slides from the presentation, including those containing screenshots of the Victim Company Toolbox, to a senior Live Nation executive ("Executive-5") on or about August 28, 2014.   Zaidi asked Executive-5 to maintain the confidentiality of the slides because they provided "a look into the [the Victim Company] platform."

41.     In or about August 2014, Corporate Officer-2 promoted Zaidi to head of TICKETMASTER's Artist Services division.   In or about January 2015, Coconspirator-1 was transferred from TicketWeb, promoted to Director of Client Relations in TICKETMASTER's Artist Services division, and given a raise.   Coconspirator-1 worked directly for Zaidi in Artist Services.   Following the announcement of his promotion, on or about January 13, 2015, Coconspirator-1 emailed another TICKETMASTER Artist Services employee: "It's great to be part of the Artist Services team! Now we can really start to bring down the hammer on [Victim Company]."

C.      July 2014-June 2015: TICKETMASTER's Continued Surveillance of the Victim Company and Intrusions Into Its Computer Systems

42.     As detailed above, the Victim Company created ticketing web pages in advance of its artist clients' tours, often before it was public knowledge that the artist had decided to use the Victim Company instead of TICKETMASTER to sell tickets.   Although the web pages were not password-protected, they were not indexed in search engines, and therefore could not be located or accessed without figuring out the exact URL for the ticketing web page, which included a series of numbers.

43.     After joining Live Nation, Coconspirator-1 explained to Zaidi and others how the "store ID" numbers in the URLs for the Victim Company's ticketing web pages were numbered sequentially, enabling TICKETMASTER employees to browse through them to find and monitor new ticketing web pages to learn which artists planned to use the Victim Company to sell tickets for their shows.   Coconspirator-1 used this information periodically to search for new Victim Company ticketing web pages, and sent the URLs to TICKETMASTER executives to provide intelligence about the Victim Company's business and artist clients.

44.      For example, on or about July 14, 2014, Coconspirator-1 sent an email to Executive-1, Zaidi and another TICKETMASTER executive ("Executive-6") identifying 12 URLs for Victim Company ticketing web pages that had not been publicly disseminated, in order to make the executives aware of "what the scallywags over at [the Victim Company] are working on." Coconspirator-1 followed this email on or about July 22, 2014, with an email to the same TICKETMASTER executives with two new URLs to Victim Company ticketing web pages, writing, "More new [Victim Company] activity for you."   On or about July 29, 2014, Coconspirator-1 sent another email with four new URLs to Victim Company ticketing web pages to the same TICKETMASTER executives, writing "Today's [Victim Company] client update," and followed with an assessment stating: "[Victim Company] are having a higher success rate as seen in the amount of test sites being updated to a live pre-sale campaigns as of late." Coconspirator-1 then asked the TICKETMASTER executives whether there had been any progress determining "what we can offer to deter these artists/managers from using [Victim Company] services?"

45.      In or about January 2015, Zaidi assigned a TICKETMASTER employee based in Los Angeles, California to learn what he called the Victim Company's "link numbering system" from Coconspirator-1 so that the employee could actively search for and monitor the ticketing web pages created by the Victim Company for competitive intelligence.   That employee maintained a spreadsheet listing every Victim Company ticketing web page that TICKETMASTER had been able to locate, along with contact information for the artist and artist management company associated with each ticketing web page, so that TICKETMASTER could identify the Victim Company's clients and attempt to dissuade them from selling tickets through the Victim Company.   A version of the list, which was emailed on or about February 25, 2015,

to Coconspirator-1, Zaidi and another TICKETMASTER executive ("Executive-7"), among others, documented 124 URLs for Victim Company ticketing web pages.

46.     Coconspirator-1, Zaidi and other TICKETMASTER employees were conscious of the need to prevent the Victim Company from learning that TICKETMASTER was monitoring the Victim Company's ticketing web pages.   For example, on or about August 15, 2014, after Coconspirator-1 sent an email with two URLs for Victim Company ticketing web pages, Zaidi and Executive-6 discussed whether to approach an artist's manager to inquire about whether the artist was working with the Victim Company.   Zaidi expressed reservations about doing so, explaining that "[t]he problem is we're not supposed to tip anyone off that we have this view into [the Victim Company's] activities.   We'll have to keep monitoring."

47.     Similarly, on or about June 3, 2015, after Coconspirator-1 sent an email with two URLs for Victim Company ticketing web pages, another TICKETMASTER employee asked whether he should contact the Victim Company directly.   Coconspirator-1 responded, "As they are just test URL's for now, let's hold off showing our hand on what we know they're working on."

48.     Coconspirator-1 and other Live Nation and TICKETMASTER employees also continued to access Victim Company Toolboxes without authorization.   Victim Company server log data shows at least 25 discrete instances of access to Victim Company toolboxes between August 2013 and December 2015 from computers accessing the Internet from IP addresses registered to TICKETMASTER and to other Live Nation subsidiaries in New York, San Francisco and Los Angeles.   Because the Toolboxes contained information about tours, access to the Toolboxes permitted TICKETMASTER to monitor artists and managers with whom the Victim Company was working.

49.     For example, on or about January 16, 2015, Coconspirator-1 forwarded to Executive-7 his January 9, 2014 email to Executive-1 and Zaidi that contained usernames and passwords for three Victim Company Toolboxes.   Coconspirator-1 thereafter called Executive-7, who was based in Los Angeles, and offered to show Executive-7 what was "under the hood" of the Victim Company's Toolboxes.   Coconspirator-1 and Executive-7 thereafter both logged into a Toolbox together, and Coconspirator-1 gave Executive-7 a tour of the application.   Log data from the Victim Company reflects that on or about January 16, 2015, an individual using an IP address registered to TICKETMASTER's Los Angeles office and an individual using an IP address registered to a different Live Nation subsidiary simultaneously logged into the same Toolbox.

50.     In or about February 2015, Coconspirator-1 gave a group of employees working for Executive-7 a similar demonstration of a Toolbox when Coconspirator-1 visited TICKETMASTER's Los Angeles office.   This unauthorized access was similarly documented in the Victim Company's server logs.

IV.     The Victim Company Sues Live Nation and TICKETMASTER

51.     In or about September 2014, Executive-1 resigned from Live Nation and TICKETMASTER.   Executive-1 subsequently began to work for the Victim Company on or about June 16, 2015.   After joining the Victim Company, Executive-1 warned the Victim Company to change the sequential numbering system for the Victim Company's ticketing web pages.   The Victim Company thereafter changed the way that it generated URLs for its ticketing web pages specifically to prevent Live Nation and TICKETMASTER employees from finding and accessing them.

52.     By August 2015, Coconspirator-1 and other TICKETMASTER executives began to notice that they had lost the ability to access Victim Company data and information that they had previously been able to access.    In internal emails, Coconspirator-1 and other TICKETMASTER executives attributed their loss of access to Executive-1 warning the Victim Company of their conduct.    Specifically, they discussed how the Victim Company had "a really slick web-based demo for clients" which was now "password protected," that TICKETMASTER "can probably thank [Executive-1] for that one," and joked that they should email Executive-1 for these new passwords, but that doing so "might raise a red flag."

53.     In or about December 2015, the Victim Company filed a civil complaint against Live Nation and TICKETMASTER alleging antitrust violations, and amended the lawsuit in February 2017 to add allegations that Live Nation and TICKETMASTER had accessed the Victim Company's computer systems without authorization.

54.     In or about January 2018, Live Nation, TICKETMASTER and the Victim Company announced that they had settled the lawsuit, and that Live Nation acquired the Victim Company's remaining technology assets, including its ticketing commerce platform, patent portfolio and other assets.

<u>COUNT ONE</u>
(Conspiracy to Commit Computer Intrusions)

55.     The allegations contained in paragraphs one through 54 are realleged and incorporated as if fully set forth in this paragraph.

56.     In or about and between August 2013 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TICKETMASTER, together with others, did knowingly and willfully conspire to:

(a)     intentionally access without authorization one or more computers, to wit: computers belonging to the Victim Company, and thereby to obtain information, to wit: intellectual property, proprietary business information regarding client relationships and future business plans, from one or more protected computers for the purpose of commercial advantage and private financial gain, and in furtherance of criminal and tortious acts in violation of the laws of the United States and any State, and the value of the information exceeded $5,000, contrary to Title 18, United States Code, Sections 1030(a)(2)(C), 1030(b), 1030(c)(2)(A) and 1030(c)(2)(B); and

(b)     with intent to defraud, access without authorization one or more protected computers, to wit: computers belonging to the Victim Company, and by means of such conduct to further the intended fraud and obtain something of value, to wit: intellectual property, proprietary business information regarding client relationships and future business plans, contrary to Title 18, United States Code, Sections 1030(a)(4), 1030(b) and 1030(c)(3)(A).

57.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant TICKETMASTER, together with others, did commit and cause the commission of, among others, the following:

<u>OVERT ACTS</u>

(a)     On or about and between November 14, 2013 and November 18, 2013, both dates being approximate and inclusive, Coconspirator-1 provided several TICKETMASTER employees with information regarding the Victim Company's client base and other information to which Coconspirator-1 had access because of his former employment at the Victim Company.

(b)     On or about and between January 8 and 9, 2014, both dates being approximate and inclusive, Coconspirator-1 accessed without authorization one or more Victim Company Toolboxes hosted on Victim Company computers through wire communications passing through the Eastern District of New York;

(c)     On or about and between January 10, 2014 and January 24, 2014, both dates being approximate and inclusive, Zaidi prepared presentations for senior management of TICKETMASTER and Live Nation, including but not limited to Corporate Officer-1 and Corporate Officer-2, and those presentations included images obtained from the Victim Company computers that were accessed without authorization;

(d)     On or about May 14, 2014, Coconspirator-1 accessed without authorization approximately 12 Victim Company Toolboxes hosted on the Victim Company computers;

(e)     On or about and between May 15, 2014 and June 18, 2014, both dates being approximate and inclusive, Zaidi prepared presentations for senior management of TICKETMASTER and Live Nation, including but not limited to Corporate Officer-1 and Corporate Officer-2, and those presentations included images taken from the Victim Company computers that were accessed without authorization;

(f)     On or about July 14, 2014, Coconspirator-1 accessed without authorization approximately 12 Victim Company ticketing web pages hosted on the Victim Company computers;

(g)     In or about January 2015, Zaidi directed a TICKETMASTER employee to monitor the Victim Company activity by accessing URLs to ticketing web pages

controlled by the Victim Company to obtain information about the Victim Company clients and potential clients; and

(h)     On or about and between January 16, 2015 and February 6, 2015, both dates being approximate and inclusive, Coconspirator-1 met with several TICKETMASTER employees in Los Angeles, California, and gave a presentation wherein Coconspirator-1 accessed without authorization one or more the Victim Company Toolboxes hosted on the Victim Company computers.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Computer Intrusion of a Protected Computer)

58.     The allegations contained in paragraphs one through 54 are realleged and incorporated as if fully set forth in this paragraph.

59.     In or about and between August 2013 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TICKETMASTER, together with others, did knowingly and intentionally access without authorization one or more computers, to wit: computers belonging to the Victim Company, and thereby did obtain information, to wit: intellectual property, proprietary business information regarding client relationships and future business plans, from one or more protected computers for the purpose of commercial advantage and private financial gain, and in furtherance of criminal and tortious acts in violation of the laws of the United States and any State, and the value of the information exceeded $5,000.

(Title 18, United States Code, Sections 1030(a)(2)(C), 1030(c)(2)(A), 1030(c)(2)(B), 2 and 3551 et seq.)

## COUNT THREE
(Computer Intrusion in Furtherance of Fraud)

60.     The allegations contained in paragraphs one through 54 are realleged and incorporated as if fully set forth in this paragraph.

61.     In or about and between August 2013 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TICKETMASTER, together with others, did knowingly, and with intent to defraud, access without authorization one or more protected computers, to wit: computers belonging to the Victim Company, and by means of such conduct did further the intended fraud and obtain something of value, to wit: intellectual property, proprietary business information regarding client relationships and future business plans.

(Title 18, United States Code, Sections 1030(a)(4), 1030(c)(3)(A), 2 and 3551 et seq.)

## COUNT FOUR
(Wire Fraud Conspiracy)

62.     The allegations contained in paragraphs one through 54 are realleged and incorporated as if fully set forth in this paragraph.

63.     In or about and between August 2013 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TICKETMASTER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Victim Company, and to obtain money and property from the Victim Company, to wit: intellectual property, proprietary business information regarding client relationships and future business plans, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign

commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNT FIVE</u>
(Wire Fraud)

64.     The allegations contained in paragraphs one through 54 are realleged and incorporated as if fully set forth in this paragraph.

65.     In or about and between August 2013 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TICKETMASTER, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Victim Company, and to obtain money and property from the Victim Company, to wit: intellectual property, proprietary business information regarding client relationships and future business plans, by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: the unauthorized use of login credentials of authorized users of Victim Company Artist Toolboxes and the unauthorized access to Victim Company ticketing web pages to obtain unauthorized access to Victim Company Toolboxes and Victim Company ticketing web pages to steal intellectual property, proprietary business information regarding client relationships and future business plans belonging to the Victim Company.

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH THREE

66.     The United States hereby gives notice to the defendant that, upon the defendant's conviction of any the offenses charged in Counts One through Three, the government will seek forfeiture in accordance with Title 18, United States Code, Sections 982(a)(2) and 1030(i)(1), which require any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses, and such person's interest in any personal property that was used or intended to be used to commit or to facilitate such offenses.

67.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1) and 1030(i)(2), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2), 982(b)(1), 1030(i)(1) and 1030(i)(2); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT FOUR AND FIVE

68.    The United States hereby gives notice to the defendant that, upon the defendant's conviction of either of the offenses charged in Counts Four and Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses, to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

69.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

        (Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2020R01158

FORM DBD-34

JUN. 85

No. 20-CR-563 (MKB)

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*Ticketmaster L.L.C.,*

Defendant.

# INFORMATION

( T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(2), 982(b)(1), 1030(a)(2)(C), 1030(a)(4), 1030(c)(2)(A), 1030(c)(2)(B), 1030(c)(3)(A), 1030(i)(1), 1030(i)(2), 1343, 1349, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

***Allon Lifshitz, Craig R. Heeren and Ian C. Richardson***
***Assistant U.S. Attorneys (718) 254-7000***